UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
CLEARTHUR NELSON,

                        Plaintiff,

                                                    MEMORANDUM & ORDER
            -against-                               12-CV-1810(JS)

CAROLYN W. COLVIN,
Commissioner of the Social Security
Administration[1],

                        Defendant.
---------------------------------------X
APPEARANCES
For Plaintiff:      Michael Brangan, Esq.
                    Sullivan & Kehoe
                    44 Main Street
                    Kings Park, NY 11754

For Defendant:      Vincent Lipari, Esq.
                    United States Attorney's Office
                    Eastern District of New York
                    610 Federal Plaza, 5th Floor
                    Central Islip, NY 11722

        Plaintiff Clearthur Nelson ("Plaintiff") commenced this

action pursuant to Section 205(g) of the Social Security Act, as

amended, 42 U.S.C. § 405(g), challenging defendant the Commissioner

of Social Security's (the "Commissioner" or "Defendant") denial

of Plaintiff's application for disability insurance benefits and

Supplemental Security Income ("SSI").  Presently before the Court

are Plaintiff's and the Commissioner's cross-motions for judgment

---

[1] The Clerk of the Court is directed to amend the docket to
reflect that Carolyn W. Colvin is now the Acting Commissioner of
Social Security.

on the pleadings.    For the following reasons, the Commissioner
motion is GRANTED and Plaintiff's motion is DENIED.

<u>BACKGROUND</u>

On February 26, 2009, Plaintiff filed an application for
disability insurance benefits and SSI, asserting that he has been
disabled, and therefore unable to work, since December 1, 2008,
due to left shoulder, bicep, and knee impairments; chronic lower
back pain; jaw pain due to a post-fracture repair; right metacarpal
fracture; and hypertension.    (R. 20, 22, 106-07.)[2]    Plaintiff's
application was denied on April 23, 2009. (R. 56-65.)    On May 14,
2009, Plaintiff requested a hearing before an administrative law
judge ("ALJ").    (R. 70-71.)

A hearing took place before ALJ Scott C. Firestone
on July 29, 2010.  (R. 30-55.)  Plaintiff appeared in person, was
represented by counsel, and was the only witness to testify at the
hearing.  (R. 30-55.)

The Court's review of the administrative record will
proceed as follows:  <u>First</u>, the Court will summarize the relevant
evidence that was presented to the ALJ; <u>second</u>, the Court will
review the ALJ's findings and conclusions; and <u>third</u>, the Court
will review the Appeals Council's decision.

---

[2] "R." denotes the administrative record filed by the
Commissioner on December 11, 2012.  (Docket Entry 10.)

I.  Evidence Presented to the ALJ

        The Court will briefly summarize Plaintiff's testimonial
evidence and employment history before addressing Plaintiff's
medical records.

    A.  Testimonial Evidence and Employment History

        Plaintiff was born on January 11, 1958.  (R. 33.)  He
dropped out of school in the eighth grade but is able to read and
write.  (R. 39-40.)  From March 2007 to December 2008, Plaintiff
was incarcerated for two years for drug possession.  (R. 37.)
Plaintiff testified that he was assaulted while incarcerated and
suffered a fractured jaw, which required surgery and a metal plate
implant to repair.  (R. 49-50.)

        In his Work History Report, Plaintiff listed the
following employment history:  (1) from 1981 to 1982, Plaintiff
worked as a laborer; (2) from 1982 to 1986, Plaintiff worked in
maintenance for J.C. Penney; (3) from 1986 to 1988, Plaintiff
worked for a bus company; (4) from 1988 to 1990, Plaintiff was a
security guard; (5) from 1999 to 2004, Plaintiff worked as a
construction truck driver and laborer. (R. 156.)  The Work History
Report does not indicate Plaintiff's employment status for the
years from 1990 to 1998 and 2004 to 2007.  However, Plaintiff
testified that he last worked in construction in 2000 (R. 42), but
he also stated that he was laid off from work in December 2006,
(R. 127).  Plaintiff testified that since his release from prison

in December 2008, Plaintiff has not worked, nor has he sought employment. (R. 45.)

Plaintiff testified that he spends most of his time watching television, sleeping, preparing meals for himself, and "try[ing] to make [himself] comfortable." (R. 51-54.) Plaintiff lives with his fiancé and four of his six children. (R. 43-44.) He claims to have no hobbies and does not do any household chores. (R. 52, 54.) His driver's license was suspended for failure to make child support payments. (R. 43.) He also receives welfare assistance in the form of food stamps. (R. 45.)

In his application for disability benefits, Plaintiff claimed that he had become disabled as of December 1, 2008. (R. 102, 106.) However, Plaintiff explained during his hearing that he had been experiencing pain in his knees, arm, and back for some time prior to his application, but only applied after his release from prison. (R. 33-37, 41.)

Plaintiff testified that he has "severe back pain" and that he cannot sit for longer than five minutes before having to move and that he cannot walk or stand for more than ten minutes. (R. 34-35.) He attended his hearing with a cane that was prescribed to him "back in the 90s," but he also testified that he does not always use it. (R. 33.) Plaintiff also testified that he can lift only about ten pounds due to a tear of his left bicep that he sustained while incarcerated. (R. 35-36.) He claimed that when

he does lift things, like a grocery bag, he will feel discomfort, stinging, and stiffness the next day. (R. 37.) With respect to his back, Plaintiff testified that his lower back pain is an "aching, stabbing, throbbing pain" and that the pain can go up to a ten out of ten when he is not on medication, but when he is on medication, the average is only three out of ten. (R. 47-48.) At the time of the hearing, Plaintiff was taking four tablets of Oxicodal per day. (R. 48.) Finally, Plaintiff testified that he experiences "aching" headaches due to the metal plate used to repair his jaw. (R. 50.)

B.    Medical Evidence

In addition to Plaintiff's testimony, the ALJ also had before him all of Plaintiff's medical records. Plaintiff first sought medical attention on February 2, 2008 from the Nassau University Medical Center for jaw pain and contusions to the shoulder and knee. (R. 171-72.) A computed tomography ("CT") scan revealed an age-indeterminate fracture of the right mandibular ramus and an old fracture of the left anterior mandible coupled with a metal fixation. (R. 172.)

Plaintiff returned to the Nassau University Medical Center on February 19, 2009, complaining of a sore throat and body pain. (R. 174.) During this visit, Plaintiff claimed that he began experiencing pain in his left arm, at a score of six out of ten, six months prior to the visit; pain in his jaw, at a score of

nine out of ten, one year prior to the visit; and chronic pain in his right knee, at a score of nine out of ten. (R. 174.)

On March 30, 2009, Plaintiff saw Dr. Sandra Pascal, D.O. for pain in his back, left arm, and jaw. (R. 189.) Dr. Pascal examined Plaintiff and found an unspecified decrease in range of motion for Plaintiff's left shoulder and decreased strength in his left arm. (R. 189-90.) Dr. Pascal diagnosed Plaintiff with gingivitis, chest pain, uncontrolled benign essential hypertension, and a ruptured bicipital tendon of the left arm. (R. 190.) Thereafter, on April 6, 2009, Dr. Pascal completed a Medical Report for Determination of Disability/Employability for the Nassau County Department of Social Services. (R. 201-02.) In her report, Dr. Pascal diagnosed Plaintiff with hypertension, asthma, and chest pain. (R. 201.) Further, Dr. Pascal concluded that Plaintiff was disabled and not employable because, "as per patient," he was "unable to sit, or stand in one position for long periods due to back pain." (R. 201.)

On April 3, 2009, Dr. Samir Dutta conducted a consultative examination of Plaintiff on behalf of the Social Security Administration. (R. 179-82.) Dr. Dutta noted that Plaintiff "appeared to be in no acute distress," had normal gait and station, and "needed no help changing for the exam or getting on and off [the] exam table." (R. 180-81.) Dr. Dutta also noted that Plaintiff declined to walk on his toes or heels and did not

use an assistive device, but that he could only squat halfway. (R. 180-81.) Dr. Dutta further concluded that Plaintiff's fine motor activity of the hands was normal, with a grip strength of five out of five bilaterally. (R. 181.) Dr. Dutta found that Plaintiff had a full range of motion of the elbows, forearms, wrists, and fingers. (R. 181.) Dr. Dutta further noted that Plaintiff had forward elevation and abduction of the right shoulder to 120 degrees but only 90 degrees with respect to the left shoulder. (R. 181.)

Upon thoracic and lumbar spine examination, Dr. Dutta noted that there was a "[s]light spasm . . . on the lower lumbar area," but that there was no spinal, paraspinal, SI joint, or sciatic notch tenderness. (R. 181.) Dr. Dutta also conducted a straight leg raise test, which was negative bilaterally. (R. 181.) Dr. Dutta's examination of Plaintiff's lower extremities was normal: Plaintiff had full range of motion in his ankles, and no muscle atrophy or sensory abnormality. (R. 181.)

Dr. Dutta's prognosis following the exam was "[m]ild to moderate limitation for sitting, standing, walking, bending, and lifting weight on a continued basis, especially using [his] left hand." (R. 182.)

Plaintiff again saw Dr. Pascal on April 14, 2009 for a follow up regarding his hypertension and lab results. (R. 192.) Dr. Pascal assessed Plaintiff with chest pain, uncontrolled benign

essential hypertension, hyperlipidemia, and folliculitis. (R. 194.)

On April 22, 2009, M. Ramos, an analyst with the New York Division of Disability Determinations, performed a Physical Residual Functional Capacity Assessment of Plaintiff. (R. 183-88.) Ramos opined that Plaintiff (1) could occasionally carry twenty pounds and could frequently lift up to ten pounds; (2) could stand or walk for about six hours per an eight-hour workday; (3) could occasionally climb, balance, stoop, kneel, crouch, and crawl; (4) had limited reaching, but unlimited handling, fingering, and feeling; and (5) had limited upper extremity pushing and pulling capabilities. (R. 184-85.) In support of these findings, Ramos noted (1) multiple surgeries to Plaintiff's arm, jaw, and knees; (2) a history of asthma and left eye problems; (3) that Plaintiff had a normal gait and station upon examination, could squat halfway, and did not use an assistive device; (4) that Plaintiff's hand and finger dexterity were intact and that he had a bilateral grip strength of five out of five; and (5) that there was a decreased range of motion and elevation in the left shoulder. (R. 184.)

On September 1, 2009, Plaintiff first saw Dr. Anand Persaud for his back pain and hypertension. (R. 204.) Dr. Persaud conducted a straight leg raise test, which was positive. (R. 204.) Dr. Persaud also observed muscle spasms and pain in the left knee

at flexion, but noted that Plaintiff had no sensory loss or motor deficiency.  (R. 204.)  Dr. Persaud prescribed heat therapy, physical therapy, OxyContin, and Flexeril, and instructed Plaintiff to get an MRI and follow up in one month.  (R. 204.)

On September 30, 2009, Plaintiff saw Dr. Persaud for a follow-up visit.  (R. 205.)  On examination, Dr. Persaud again found muscle spasms, but no sensory deficiency.  (R. 205.)  Dr. Persaud conducted another straight leg raise test, but the test was negative this time.  (R. 205.)  Dr. Persaud instructed Plaintiff to continue taking Oxycontin, obtain an MRI of the lumbar spine, and return for a follow-up visit in one month.  (R. 205.)

Plaintiff subsequently obtained an MRI of his lumbar spine from Dr. Glenn Schwartz on October 9, 2009.  (R. 213.)  The MRI results were normal.  (R. 213.)  Dr. Schwartz reported that Plaintiff's spinal alignment, intervertebral discs, and paraspinal soft tissues were normal and that there was no evidence of any occult fracture, marrow replacement process, disc bulge, herniation, or stenosis.  (R. 213.)

On October 30, 2009, Plaintiff returned to Dr. Persaud, this time complaining of knee pain.  (R. 206.)  Neurological and psychiatric examinations were normal but Dr. Persaud observed bilateral knee crepitation.  (R. 206.)  Dr. Persaud conducted another straight leg raise test, which again was negative.  (R. 206.)  Dr. Persaud's "impression" was radiculopathy and knee pain.

(R. 206.)  Dr. Persaud instructed Plaintiff to go for an orthopedic evaluation and follow up in another month.  (R. 206.)

Plaintiff's back and knee pain continued and he again saw Dr. Persaud on November 30, 2009 for a follow-up visit. (R. 207.)  Dr. Persaud checked boxes on a patient assessment form indicating that Plaintiff had pain when "bending forward at waist," "standing," "sitting," and "walking."  (R. 207.)  However, Dr. Persaud also noted that the pain was controlled by medication, that Plaintiff showed no sensory loss or pain with range of motion, and that a straight leg raise test was negative.  (R. 207.)  Dr. Persaud diagnosed Plaintiff with myalgia and osteoarthritis, prescribed OxyContin, and recommended a pain specialist.  (R. 207.)

Plaintiff saw Dr. Persaud again on December 23, 2009. (R. 208.)  Dr. Persaud's notes for this visit did not indicate whether he conducted an examination but simply noted Plaintiff's complaints of back and knee pain and request for OxyContin.  (R. 208.)

Plaintiff first saw Dr. Nityananda Podder, a neurologist at Interventional Pain Management, on December 29, 2009.  (R. 217.) Plaintiff complained of lower back pain for the last ten years and pain in his left shoulder and right wrist. (R. 217.)  During this visit, Dr. Podder observed that Plaintiff had an antalgic gait due to pain, as well as pain in the left knee and shoulder with range of motion.  (R. 217.)  Plaintiff had normal strength and sensation,

and a straight leg raise test was negative.  (R. 217.)  Dr. Podder diagnosed Plaintiff with arthropathy of the lumbar facet, left knee, and left shoulder, and prescribed Plaintiff Percocet and morphine.  (R. 217.)

Plaintiff saw Dr. Persaud again on December 23, 2009. (R. 208.)  Dr. Persaud's notes for this visit did not indicate whether he conducted an examination but simply noted Plaintiff's complaints of back and knee pain.  (R. 208.)

Plaintiff then saw Dr. Podder on January 26, 2010.  (R. 216.)  Plaintiff told Dr. Podder that medication moderately relieved his pain and that "Percocet helps him function," but that the pain reoccurred and interfered with his daily activities and sleep.  (R. 216.)  Plaintiff also claimed that the pain in his lower back increased with bending and lifting heavy objects and that he could not work due to the back pain.  (R. 216.)  On examination, Dr. Podder observed that Plaintiff had left shoulder pain with abduction of more than ninety degrees and tenderness with palpation.  (R. 216.)  Plaintiff's motor and sensory results were normal and a straight leg raise test was negative, however. (R. 216.)  Dr. Podder also observed left knee clicking, crepitation with range of motion, and increased pain with lumbar flexion and extensions with tenderness in the facet joint.  (R. 216.)  Dr. Podder diagnosed Plaintiff with lumbar facet arthropathy of the

lower back and osteoarthritis of the left knee and left shoulder. (R. 216).

Plaintiff returned to Dr. Persaud on February 24, 2010, complaining of "generalized pain." (R. 210.) He also complained of pain when climbing stairs and pain with range of motion of the right knee. (R. 210.) Dr. Persaud assessed Plaintiff with radiculopathy and recommended physical therapy. (R. 210.)

On March 4, 2010, Plaintiff saw Dr. Podder, again complaining of left knee, left shoulder, and chronic lower back pain. (R. 215.) Plaintiff told Dr. Podder that the pain was adequately relieved by pain medication but that the pain affected his daily activities and his ability to sleep. (R. 215.) He also stated that his lower back pain increased with bending and heavy lifting and that he was unable to work due to the pain. (R. 215.) Upon examination, sensory and motor functions were normal and a straight leg raise test was negative. (R. 215.) However, Podder did observe clicking of the left knee and crepitation with range of motion. (R. 215.) Dr. Podder assessed Plaintiff was with lumbar facet arthropathy of the lower back and left knee and left shoulder osteoarthritis. (R. 215.) Dr. Podder advised Plaintiff to consider a "lumbar facet block" and physical therapy for Plaintiff's lower back pain. (R. 215.)

Plaintiff visited Dr. Persaud again on March 26, 2010. (R. 211.) Plaintiff complained of pain while "bending forward at

waist," "getting out of bed," "standing," and "sitting." (R. 211.)
Dr. Persaud's notes for this visit did not indicate whether he
examined Plaintiff. (R. 211.) Dr. Persaud scheduled Plaintiff
for epidural injections and recommended more physical therapy and
pain management consultation. (R. 211.)

On April 13, 2010, Plaintiff returned to Dr. Podder for
a follow-up visit. (R. 214.) Plaintiff's complaints were
identical to those of his January 24, 2010 and March 4, 2010
visits. (R. 214.) Dr. Podder again noted that Plaintiff had
"persistent low back pain, with any physical activity." (R. 214.)
Plaintiff's sensory and motor functions were normal and a straight
leg raise test was negative, but Dr. Podder did note clicking of
the left knee and crepitation with range of motion. (R. 214.)
Dr. Podder's observations and diagnoses did not change. (R. 214.)

On June 23, 2010, Dr. Persaud completed a Medical
Assessment of Ability to Do Work-Related Activities form. (R. 220-
23.) In the Medical Assessment, Dr. Persaud opined that Plaintiff
(1) could carry ten pounds occasionally for a maximum of two hours
per an eight-hour day; (2) could carry ten pounds frequently for
less than one-third of an eight-hour day; (3) could sit for only
three hours per an eight-hour day and only fifteen minutes without
interruption; and (4) could never climb, occasionally stoop,
occasionally crouch, never kneel, and never crawl. (R. 220-21.)
Dr. Persaud based his assessment on medical findings of

radiculopathy, neuropathy, a positive straight leg raise test, muscle spasms, sensory defects, positive crepitation of the knees bilaterally, and Plaintiff's subjective symptoms of pain while standing for more than thirty minutes and during activity. (R. 220-21.)

## II. Decision of the ALJ

After reviewing all of the above evidence, the ALJ issued his decision on August 6, 2010, finding that Plaintiff is not disabled. (R. 20-29.) The ALJ concluded that although Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,] . . . [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with [the ALJ's] functional capacity assessment [that Plaintiff has the capacity to perform the full range of light work as defined in 20 C.F.R. 416.967(b)]." (R. 25.) The ALJ gave the greatest weight to Dr. Dutta's opinion because it was "generally consistent with the clinical signs and treatment received, as well as the examination." (R. 25.) The ALJ accorded "very little weight" to the opinion of Dr. Pascal because she examined Plaintiff on only two occasions and her opinion was "not supported by any diagnostic tests or significant clinical signs." (R. 23.) Lastly, the ALJ afforded "limited weight" to Dr. Persaud's opinion because it was not supported by the evidence in the record, it was largely

14

conclusory, and it relied heavily on Plaintiff's subjective complaints with very little explanation of the objective evidence Dr. Persaud relied on in forming his opinion. (R. 24.) Moreover, the ALJ explained that Dr. Persaud's own records failed to reveal the type of significant clinical and diagnostic abnormalities that would be expected if Plaintiff was disabled. (R. 24.)

Plaintiff sought review of this decision by the Appeals Council and Plaintiff's counsel submitted a letter outlining his legal arguments as additional evidence in support of his request. (R. 168-70.) On February 17, 2012, the Appeals Council denied Plaintiff's appeal of the ALJ's determination, stating that they "found no reason under [the] rules to review the Administrative Law Judge's decision." (R. 1.) Thus, the ALJ's decision is considered the final decision of the Commissioner. (R. 1.)

Plaintiff commenced this action on April 12, 2012. (Docket Entry 1.) The Commissioner filed her Answer and the administrative record on December 11, 2012. (Docket Entries 9, 10.) On April 4, 2013, the Commissioner moved for judgment on the pleadings (Docket Entry 13), and on May 3, 2013, Plaintiff cross-moved for judgment on the pleadings (Docket Entry 16). These motions are presently before the Court.

DISCUSSION

I.  Standard of Review

        In reviewing the ruling of the ALJ, this Court will not
determine de novo whether Plaintiff is entitled to SSI or
disability benefits.  Thus, even if the Court may have reached a
different decision, it must not substitute its own judgment for
that of the ALJ.  See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir.
1991).  Instead, this Court must determine whether the ALJ's
findings are supported by "substantial evidence in the record as
a whole or are based on an erroneous legal standard."  Curry v.
Apfel, 209 F.3d 117, 122 (2d Cir. 2000) (internal quotations marks
and citation omitted), superseded by statute on other grounds, 20
C.F.R. § 404.1560(c)(2).  If the Court finds that substantial
evidence exists to support the Commissioner's decision, the
decision will be upheld, even if evidence to the contrary exists.
See Johnson v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003).
"Substantial evidence is such evidence that a reasonable mind might
accept as adequate to support a conclusion."  Id. (citing
Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28
L. Ed. 2d 842 (1971)).  The substantial evidence test applies not
only to the ALJ's findings of fact, but also to any inferences and
conclusions of law drawn from such facts.  See id.

        To determine if substantial evidence exists to support
the ALJ's findings, this Court must "examine the entire record,

16

including contradictory evidence and evidence from which conflicting inferences may be drawn." See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotation marks and citation omitted). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g).

## II. Eligibility for Benefits

A claimant must be disabled within the meaning of the Social Security Act (the "Act") to receive SSI or disability benefits. See Byam v. Barnhart, 336 F.3d 172, 175 (2d Cir. 2003); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); 42 U.S.C. §§ 423(a)(1)(A), 1381a. A claimant is disabled under the Act when he can show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The claimant's impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner must apply a five-step analysis when determining whether a claimant is disabled as defined by the Act.

See <u>Berry v. Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982); <u>Petrie</u> <u>v. Astrue</u>, 412 F. App'x 401, 404 (2d Cir. 2011). <u>First</u>, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). <u>Second</u>, the claimant must prove that he suffers from a severe impairment that significantly limits his mental or physical ability to do basic work activities. <u>Id.</u> §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). <u>Third</u>, the claimant must show that his impairment is equivalent to one of the impairments listed in Appendix 1 of the Regulations. <u>Id.</u> §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). <u>Fourth</u>, if his impairment or its equivalent is not listed in the Appendix, the claimant must show that he does not have the residual functional capacity to perform tasks required in his previous employment. <u>Id.</u> §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). <u>Fifth</u>, if the claimant successfully makes these showings, the Commissioner must determine if there is any other work within the national economy that the claimant is able to perform. <u>Id.</u> §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The claimant has the burden of proving the first four steps of the analysis, while the Commissioner carries the burden of proof for the last step. See <u>Rosa v. Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); <u>Poupore v. Astrue</u>, 566 F.3d 303, 306 (2d Cir. 2009). "In making the required determinations, the Commissioner must consider: (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3)

the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." Boryk ex rel. Boryk v. Barnhart, No. 02-CV-2465, 2003 WL 22170596, at *8 (E.D.N.Y. Sept. 17, 2003) (citing Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)).

In the present case, the ALJ performed the above analysis, and his conclusions as to the first three steps are not in dispute. He found that Plaintiff had not been engaged in substantial gainful activity since February 26, 2009 and that his impairments (status post jaw fracture repair, left bicep tendon repair, left knee and left shoulder repair, and chronic low back pain) cause more than minimal limitations in Plaintiff's ability to perform basic work activities. (R. 22.) The ALJ next determined that neither Plaintiff's impairments nor their medical equivalent was among those enumerated in Appendix 1. (R. 22.) At step four, the ALJ determined that Plaintiff had the residual functional capacity to perform a full range of light work as defined in 20 C.F.R. § 416.967(b)[3] and that Plaintiff had no past relevant work

---

[3] "Light work" is that which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," and "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b). "To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." Id.

as defined in 20 C.F.R. § 416.965. (R. 25.)  At step five, relying

on the medical-vocational guidelines set forth in the Regulations,

20 C.F.R. Pt. 404, Subpt. P, App. 2 (the "Grids"), the ALJ found

that, "[c]onsidering [Plaintiff's] age, education, work experience

and residual functional capacity, there are jobs that exist in

significant numbers in the national economy that [Plaintiff] can

perform." (R. 25.)  Therefore, the ALJ concluded that Plaintiff

is not disabled under the Act. (R. 26.)

            The Court must determine whether this final decision is

supported by substantial evidence.  With respect to any new

evidence submitted to the Appeals Council, it is deemed part of

the record and will be considered by the Court when determining if

there is substantial evidence to support the Commissioner's final

decision.  See Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)

("When the Appeals Council denies review after considering new

evidence, we simply review the entire administrative record, which

includes the new evidence, and determine, as in every case, whether

there is substantial evidence to support the decision . . . .").

Here, the only additional evidence submitted to the Appeals Counsel

was an attorney letter from Plaintiff's counsel outlining the

arguments of their case; no other medical evidence has been

offered.

            Plaintiff argues that the ALJ erred in finding that

Plaintiff is not disabled because:  (1) the ALJ failed to adhere

to the treating physician rule in determining the appropriate amount of weight to afford Dr. Persaud's and Dr. Pascal's opinions; (2) the ALJ improperly discredited Plaintiff's subjective complaints of pain; and (3) the ALJ's determination that Plaintiff could perform "light work" was "random and unsubstantiated." (Pl.'s Br., Docket Entry 15, at 9-14.)  The Court will address these arguments separately.

A.    Treating Physician Rule

Plaintiff argues that the ALJ improperly weighed the evidence when he gave limited weight to Dr. Persaud's and Dr. Pascal's opinions.  The Court disagrees.

Under the treating physician rule, the medical opinions and reports of a claimant's treating physicians are to be given "special evidentiary weight."  Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). Specifically, the regulations state:

> Generally, we give more weight to opinions from your treating sources . . . .  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  When an ALJ does not accord controlling weight to the medical opinion of a treating physician, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion."  Halloran v. Barnhart,

362 F.3d 28, 32 (2d Cir. 2004) (citation omitted); see also

Schnetzler v. Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008).

These factors include:

> (1) the length of the treatment relationship
> and frequency of the examination; (2) the
> nature and extent of the treatment
> relationship; (3) the extent to which the
> opinion is supported by medical and laboratory
> findings; (4) the physician's consistency with
> the record as a whole; and (5) whether the
> physician is a specialist.

Schnetzler, 533 F. Supp. 2d at 286 (citing 20 C.F.R.

§§ 404.1527(d)(2), 416.927(d)(2); Halloran, 362 F.3d at 32).

Additionally, the ALJ is required to provide "'good reasons' for

the weight she gives to the treating source's opinion." Halloran,

362 F.3d at 32-33 (citation omitted); see also Pagan v. Apfel, 99

F. Supp. 2d 407, 411 (S.D.N.Y 2000) ("At the very least, the

Commissioner must give express recognition to a treating source's

report and explain his or her reasons for discrediting such a

report."). "Failure to provide 'good reasons' for not crediting

the opinion of a claimant's treating physician is a ground for

remand." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citation

omitted). The Court finds that the ALJ's decision is in accord

with the treating physician rule.

Plaintiff first contends that the ALJ violated the

treating physician rule because he "overlooked Dr. Persaud's

medical opinion as the treating physician." (Pl.'s Br. at 13.)

However, contrary to Plaintiff's contention, the ALJ expressly considered each of Dr. Persaud's opinions and adequately explained his reasons for giving them limited weight. (R. 24.) The ALJ explained that he did not afford Dr. Persaud's opinion significant weight because it was not supported by the evidence in the record, it was largely conclusory, and it relied heavily on Plaintiff's subjective complaints with very little explanation of the objective evidence Dr. Persaud relied on in forming his opinion. (R. 24.) Moreover, the ALJ explained that "[Dr. Persaud's] own records fail[ed] to reveal the type of significant clinical and diagnostic abnormalities [that would be] expected if [Plaintiff] was disabled." (R. 24.) In making these determinations, the ALJ reviewed and addressed the medical records from each of Plaintiff's visits with Dr. Persaud. (R. 23-24.)

Here, the Court finds that the ALJ's decision to give limited weight to Dr. Persaud's opinion is supported by substantial evidence. First, the ALJ noted that Dr. Persaud diagnosed Plaintiff with radiculopathy but did not conduct an EMG/NCV study. (R. 24.) Rather, Dr. Persaud based his assessment of radiculopathy on a positive straight leg test during Plaintiff's examination on September 1, 2009 and Plaintiff's muscle spasms during Plaintiff's examinations on September 1 and 30, 2009. (R. 223-24.) However, Dr. Persaud subsequently conducted three negative straight leg raise tests during examinations on September 30, October 30, and

November 30, 2009.  (R. 205-07.)  "[T]he Second Circuit has stated that it is entirely appropriate to give a treating physician's opinion less weight when it is internally inconsistent." Sisto v. Colvin, No. 12-CV-2258, 2013 WL 4735694, at *9 (E.D.N.Y. Sept. 3, 2013) (citing Micheli v. Astrue, 501 F. App'x 26, 28 (2d Cir. 2012)).  Moreover, Dr. Persaud's notes do not indicate a finding of muscle spasms during Plaintiff's subsequent visits on October 30 and November 30, 2009, (R. 206-07), and the Second Circuit also has stated that "[t]he [Commissioner] is entitled to rely not only on what the record says, but also on what it does not say." Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983).  Second, an MRI of Plaintiff's lower back prescribed by Dr. Persaud on October 9, 2009 was unremarkable:  Plaintiff's spinal alignment, intervertebral discs, and paraspinal soft tissues were normal, and there was no evidence of any occult fracture, marrow replacement process, disc bulge, herniation, or stenosis.  (R. 213.)  Third, during Plaintiff's visits on September 1, 30, and November 30, 2009, Dr. Persaud noted that Plaintiff showed no signs of sensory loss.  (R. 204-05, 207.)  Yet, Dr. Persaud relied on "sensory defects in feet" to support his conclusion that Plaintiff could sit for only three hours in total and fifteen minutes without interruption.  (R. 221.)  Fourth, as Plaintiff acknowledges, Dr. Persaud is not a specialist.  (Pl.'s Br. at 12.)  Accordingly, the Court finds that the ALJ properly applied the treating physician

rule and that his decision to give limited weight to Dr. Persaud's
opinion was supported by substantial evidence. Sisto, 2013 WL
4735694, at *9 ("An ALJ need not give deference to a treating
source's opinion that is inconsistent with other substantial
evidence." (citing Halloran, 362 F.3d at 32)).

Plaintiff next contends that the ALJ violated the
treating physician rule because he "assigned limited weight to
[Dr. Pascal] because she had only examined [Plaintiff] on two
occasions" but "accorded some weight to Dr. Dutta who only examined
[Plaintiff] one time . . . ." (Pl.'s Br. at 13.) The Court
disagrees. Dr. Pascal opined that Plaintiff was not "employable"
because he is "unable to sit, or stand, in one position for long
periods of time due to back pain." (R. 201.) The ALJ afforded
limited weight to this conclusion because Dr. Pascal had only
examined Plaintiff on two occasions and because her conclusion was
not supported by any diagnostic tests or significant clinical
signs. (R. 23.) In fact, in her 2009 Medical Report for
Determination of Disability/Employability form, Dr. Pascal
responded to the question, "If [patient] not employable now, why
not?," by stating ""unable to sit, or stand, in one position for
long periods of time due to back pain as per patient." (R. 201
(emphasis added).). Although the ALJ's explanation for providing
Dr. Pascal's opinion limited weight is terse, the Court finds that
he has provided good reasons for his decision and that the ALJ

therefore did not violate the treating physician rule with respect
to Dr. Pascal as Plaintiff suggests.

     B.    <u>Plaintiff's Subjective Complaints</u>

     Plaintiff next argues that the ALJ improperly
discredited Plaintiff's subjective complaints of pain based on
"the absence of any disc bulges or herniations." (Pl.'s Br. at
13.) The Court disagrees. Here, the ALJ found that although
"[Plaintiff's] medically determinable impairments could reasonably
be expected to cause [his] alleged symptoms," his "statements
concerning the intensity, persistence and limiting effects of these
symptoms are not credible . . . ." (R. 25.) As discussed below,
the Court finds that there is substantial evidence in the record
to support this conclusion.

     The Second Circuit has held that "the subjective element
of pain is an important factor to be considered in determining
disability." <u>Mimms v. Heckler</u>, 750 F.2d 180, 185 (2d Cir. 1984).
However, "[t]he ALJ has the discretion to evaluate the credibility
of a claimant and to arrive at an independent judgment, in light
of medical findings and other evidence, regarding the true extent
of the pain alleged by the claimant." <u>McLaughlin v. Sec'y of
Health, Educ. & Welfare</u>, 612 F.2d 701, 705 (2d Cir. 1980)
(alteration in original) (internal quotation marks and citation
omitted). The Court will uphold the ALJ's decision to discount a
claimant's subjective complaints of pain so long as the decision

is supported by substantial evidence.  See <u>Aponte v. Sec'y, Dep't</u> <u>of Health & Human Servs.</u>, 728 F.2d 588, 591 (2d Cir. 1984).

Here, Plaintiff's subjective complaints were contradicted by other evidence in the record as well as Plaintiff's own testimony and behavior at the hearing, specifically: (1) the MRI of Plaintiff's lumbar spine was normal (R. 213); (2) Plaintiff's doctors conducted <u>eight</u> negative straight leg raise tests (R. 181, 205-07, 214-17); (3) Plaintiff testified that he does not always use his cane for his alleged knee pain (R. 33); (4) Plaintiff reported to the consultative examiner that he was laid off from his job in 2006, not that he stopped working because of a physical impairment (R. 127); (5) Plaintiff previously applied for disability insurance three times before the instant application--in 1991, 1999, and 2003 (R. 123)--but Plaintiff testified that he worked in construction in 2000 and listed a work history that overlapped with and followed the periods for which he was allegedly disabled (R. 42, 156); (6) Plaintiff told Dr. Podder that he had experienced lower back pain for the prior ten years, he tore his bicep while lifting a 410-pound weight (R. 189, 217); and (7) the ALJ noted that although Plaintiff claimed he could not sit for more than five minutes due to pain, he sat through the nearly thirty-minute hearing "without any visible discomfort or requests to move or stand up" (R. 25).  Such contradictions constitute substantial evidence supporting the

ALJ's decision to discount Plaintiff's subjective complaints of
pain. See, e.g., Vargas v. Astrue, No. 10-CV-6306, 2011 WL
2946371, at *15 (S.D.N.Y. July 20, 2011); Shriver v. Astrue, No.
07-CV-2767, 2008 WL 4453420, at *2 (E.D.N.Y. Sept. 30, 2008).

C.    Substantial Evidence Supporting the ALJ's Conclusions

        Plaintiff finally contends that the ALJ's conclusion
that Plaintiff could perform "light work" is not supported by
substantial evidence because it "appears to be random and
unsubstantiated." (Pl.'s Br. at 13-14.) The Court disagrees.

        Under 20 C.F.R. § 416.967(b), "light work" is that which
"involves lifting no more than 20 pounds at a time with frequent
lifting or carrying of objects weighing up to 10 pounds," and
"requires a good deal of walking or standing, or when it involves
sitting most of the time with some pushing and pulling of arm or
leg controls." 20 C.F.R. § 416.967(b). "To be considered capable
of performing a full or wide range of light work, you must have
the ability to do substantially all of these activities." Id.

        First, the ALJ's determination that Plaintiff could
perform "light work" is supported by Dr. Dutta's assessment of
"mild to moderate limitation for sitting, standing, walking,
bending, and lifting weight on a continued basis, especially using
the left hand." (R. 182); see, e.g., Lewis v. Colvin, --- F. App'x
----, 2013 WL 6596942, at *1-2 (2d Cir. Dec. 17, 2013) (finding
that ALJ's determination that claimant could perform "light work"

as defined in 20 C.F.R. § 404.967(b) was supported by the doctor's assessment of "mild limitations for prolonged sitting, standing, and walking," and direction that claimant should avoid "heavy lifting, and carrying"). Second, as noted above, the ALJ was not required to give Dr. Persaud's and Dr. Pascal's opinions controlling weight because they are unsupported by objective medical evidence. Third, contrary to Plaintiff's contention, that the ALJ did not mention that Plaintiff arrived at the hearing with the aid of a cane does not compel a finding that the ALJ's determination is not supported by substantial evidence. As noted above, Plaintiff admitted at his hearing that he does not always use his cane, and Dr. Dutta noted during examination that Plaintiff did not use an assistive device, "appeared to be in no acute distress," had normal gait and station, and "needed no assistance changing for the exam or getting on and off [the] exam table." (R. 180-81.)

Finally, at step 5, the ALJ considered Plaintiff's residual functional capacity to perform light work and his "age, education, work experience" in conjunction with the Grids, and concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 25.) As discussed below, the Court finds that the Commissioner has met his burden with respect to step 5.

"At step five of the sequential analysis, the Commissioner can usually meet his burden to establish that, if a plaintiff is unable to perform his past work, there is other work which he could perform, by reliance on the Medical-Vocational guidelines . . . ." Lewis v. Astrue, No. 11-CV-1163, 2012 WL 6097303, at *6 (N.D.N.Y. Dec. 7, 2012) (citing Baldwin v. Astrue, No. 07-CV-6958, 2009 WL 4931363, at *20 (S.D.N.Y. Dec. 21, 2009)); aff'd, Lewis v. Colvin, --- F. App'x ----, 2013 WL 6596942 (2d Cir. Dec. 17, 2013). "For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled." Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996). "However, when a plaintiff suffers from significant non-exertional limitations that significantly limit his employment opportunities, exclusive reliance on the Grids is inappropriate." Lewis, 2012 WL 6097303, at *6 (quoting Baldwin, 2009 WL 4931363, at *27). "A plaintiff's range of potential employment is significantly limited when he suffers from the 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a [plaintiff's] possible range of work as to deprive him of a meaningful employment opportunity.'" Id. (quoting Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986)).

Here, there is nothing in the record to support a finding that Plaintiff suffers from significant non-exertional limitations, and Plaintiff does not argue otherwise. Accordingly,

the Court finds that the ALJ did not err in relying on the Grids to determine that jobs exist in the economy that Plaintiff can perform and that Plaintiff is not disabled.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion is GRANTED, and Plaintiff's motion is DENIED.  The Clerk of the Court is directed to mark this matter CLOSED.


                              SO ORDERED


                              /s/ JOANNA SEYBERT_____
                              Joanna Seybert, U.S.D.J.

Date: March __31__, 2014
      Central Islip, New York